The Watertown Fire Insurance Company vs. Grehan.

1. Where a policy of insurance provides that for any false swearing or attempt at fraud, "or if there shall appear any fraud in the claim, by false swearing or otherwise," such policy shall be avoided, the company, in order to avail itself of the defence, must show that the assured knowingly and intentionally swore falsely, or said or did that which is claimed to be fraudulent. There must be a wilful intent to defraud, rather than an innocent mistake; and this condition of the policy extends to every matter material to be stated, or which the policy in terms requires to be stated.

2. That the premises in this case were occupied within the meaning of the policy at the time of the fire, admits of no doubt, under the law or the facts in evidence.

3. A fire loss was promptly adjusted under a policy of insurance, and the company offered payment before the expiration of the sixty days allowed in its policy, provided a certain discount should be allowed, which was refused. At the expiration of that time, the assured promptly applied for his money, but was put off a short time, on the ground that the draft had not arrived. This was not the real reason, but the company had received information which they claimed implicated the assured in the burning of the house. They

---

*After this decision was rendered, counsel for defendant in error applied to Chief Justice Jackson for a writ of error to the Supreme Court of the United States. He refused it, holding that the case had not finally terminated, under the judgment above rendered. Application was then made to Justice Woods, of the Supreme Bench of the U. S., who also refused it. (Rep.)

did not disclose this until threatened with suit, and after suit was commenced, they threatened a prosecution to bring him to terms of settlement, and even demanded the surrender of the policy for cancellation, on the ground that, before the expiration of the sixty days, they had received affidavits proving that the house was set on fire by an incendiary several days before it was finally burned; that material damage was done at that time, and that the failure to give the company notice then or in his proofs of loss, was a concealment or misrepresentation which gave them the right of cancelling the policy. Correspondence between the company and its agent, drawn out under notice, indicated that these transactions were part of a plan to force the plaintiff to settle for a small amount: *Held*, that the jury were authorized to find damages and attorneys' fees for a refusal to pay in bad faith. ·

March 17, 1885.

Insurance. Fraud. Policy. Bad Faith. Attorney and Client. Damages. Before Judge ADAMS. Chatham Superior Court. June Term, 1884.

Grehan brought suit against the Watertown Fire Insurance Company on a policy of insurance for $2,100.00. The declaration, as amended, alleged the making of proofs of loss and demand for payment, which was refused, in bad faith. In addition to the loss, plaintiff claimed twenty-five per cent damages and $500.00 attorneys' fees.

Defendant filed the following pleas:

(1.) The general issue.

(2.) Avoidance, because the loss alleged was caused by the fraudulent act and procurement of the assured.

(3.) Avoidance, under clause avoiding for any increase of risk during the continuance of the policy known by the assured and not consented to by the company.

(4.) Avoidance on account of false swearing, fraud or attempt at fraud.

The plaintiff introduced the policy containing the conditions set out in the decision, and proved a total loss by fire on April 9, 1883; also that he made proof of loss of same, and that appraisers were appointed, and fixed the value at $1,846.44. He also showed that the com-

pany's agent offered to pay the amount of the loss before the expiration of the sixty days, less seven per cent interest, which was declined; but payment was refused after the expiration of that time.

A correspondence between the general and local agents of the company was produced under notice. In the first of these letters, the local agent stated the loss, and the general agent replied that the company was ready to pay it as soon as it could get a clear receipt, but stated that a garnishment had been served. On June 15, the local agent wrote that he had received certain information which he desired to lay before the company. He then recited substantially what is set out as the testimony of Clark below, and added:

"I do not know what time Grehan's loss is payable, but should I receive the amount, as I suppose I will, before I hear from you, I will suppress the check until I hear your pleasure in the matter. Grehan was in this afternoon to know if his money had come, as he expected it on the 11th inst. It is on this information that I take it for granted that the check will arrive before you get this. Grehan seems very anxious for the money. I said nothing to him of having seen Clark."

On June 17, the local agent wrote that the garnishment had been dismissed, and that he would take the affidavit of Clark. On June 18, the general agent wrote to the local agent to make further investigation, and added:

"If it is not too late, I want to answer that we have no funds in hand of Grehan; that is, if the garnishee is still in force; then we will keep quiet and see what offers we will get for the cash on this policy."

On June 25, the local agent wrote, enclosing the affidavit of Clark. This letter contained the following statement:

"I have refrained from saying anything to him (Grehan), except to give him evasive answers to his questions as to why the company did not send him the money, as I feared his trying to bribe these witnesses to keep quiet. I have hesitated to act pointedly in this matter in the absence of any instructions from you, but I am inclined to

the belief that Grehan can be worked on by threat of prosecution in the event of his going to law on his claim, and that when the pinch comes, he will be inclined to surrender his policy for a stipend to evade the prosecution."

Other letters followed, not material to be set forth, until, on October 12, the company, by letter, demanded of Grehan the policy for cancellation, on the ground of fraud in not communicating to them the fact that a fire had occurred in the house on April 5. It appeared that there had been a small fire on that date.

The plaintiff's evidence on this subject contains the substance of his position, and was as follows : I own the property destroyed. It cost $2,700 to $2,800. I and Pat Sweeney slept in the house; I woke, thinking I heard the wind blowing hard ; saw house was afire; woke Pat; we could not go down stairs; we slid down post of piazza. I knocked down fence and saved stable ; threw a little water on house ; couldn't save it. I claimed my loss from company before bringing suit. Three days after, loss was adjusted, and I was offered $1,846.44 less 7 per cent for sixty days. I said I rather wait and get whole amount. I told the adjuster all I knew of fire ; I didn't refer to first fire, as it was too trifling. The place in partition burned was only about three feet five inches rough boards ; some shelves were burned and a hole in the floor where demijohn was. I did not think anything of it. On my way out to the place, a man, Ulmer, told me there had been a fire there. I found some furniture piled in the kitchen. I nailed up the broken window. We came to town ; got a bed and a couple of chairs, and Sweeney and I went to sleep on place. I had a crop and cattle on the place. These folks hid away, and I did not see them. He sued me for wages ; my lawyer advised me to settle. I had lost two hogs while Clark was on the place. I told him that they could not disappear without his knowing about them. Fifty cents would have repaired the damage. The room

was 12 by 15. There were three boards, three feet five inches, burned and a few blackened.

I believe no one else fired the house on the 6th but Clark, on account of his threatening to sue me. Saw his things piled in kitchen; thought he was going to move; I had sold him some of the things; I inquired of Peggy, who nursed my wife, but could find out nothing; she lived nearest the place. At last fire I halloed for help, but none came. I thought first fire immaterial; the room burned was next to the kitchen; I had unlocked this room to take out some chicken food, and locked it again; I never tried to find out about Clark; I was glad he was gone; he was always after me to sign our agreement; I heard Clark's relatives lived near my store, but I made no inquiries for Clark; the hogs I lost never would have been lost if Clark was attending to his business; I had lived on the place a year before Clark; both dogs always barked at me when I came on the place. I considered the house worth $2,-500; the appraisers valued it at $1,840.44. I went on the place to stay till I got a man; while Clark was there, I went nearly every day; I moved my furniture from the house in the fall; I did not move it in March; I lost by the fire on 9th a few chairs, a bed and mattress; the place burned was only eleven inches wide; sixty cents would cover the loss of the 5th. Night of 9th, I was waked by noise and found house in a blaze; I had slept with my underclothes and pants on, as it was cold; Pat had on his clothes, too; I went to the place nearly every day.

Attorneys' services were shown to be worth $500.00.

The evidence on behalf of the defendant was, in brief, as follows: At the time of the adjustment, nothing was said about the fire of April 5th, and the agent did not know about it, but discovered it and the facts testified to by Clark afterwards.

The testimony of Clark, which sets out the substance of defendant's claim, was as follows:

I worked on Mr. Grehan's place, about a mile from Sa-

vannah, from last of December, 1882, till April 5th, 1883.
I went out to work the place on shares; Mr. Grehan lived
in town; we were to have a written agreement about
planting the place; it consisted of about seventy acres. I
tried several times to get the paper, but he cursed me,
and I didn't get it; but my wife and I stayed on the place.
Mr. Grehan's family tried to get the paper for me, but he
would not give it to me. I planted the place till April,
and took care of his cattle while there. In the day, when
we had nothing to do, my wife and I usually came to town;
as Mr. Grehan usually came out every day and looked
round, we left the down stairs open for him; no one but
my wife and I and Mr. Grehan could come on the place,
for there were two very fierce dogs on the place, who
would bite anybody but us. On April 2d, my wife and I
came to town; Mr. Grehan went that day; on the 3d of
April, we came to town again, and on returning that even-
ing, saw Mr. Grehan just leaving by the back road. On
reaching the house, we looked round and found everything
the same as when we left, except a room on south side of
house; this room, which Mr. Grehan sometimes kept
things locked up in, we found locked; when we left
in the morning, it was open. On the evening of the 4th
of April, before dark, I went out and drove the cattle
from the pasture and penned them up in the little yard
around the house and stable. The stable had a small yard
around it opening into the one around the house. Here
was where I penned the cattle every night, and fastened
the gates from those yards to the pasture. I tied the mare
in the stable. In a little while my wife and I went up
stairs to our room, taking the lamp with us. We had no
fire to cook supper; eat what we had; the fire had been
out since we cooked breakfast. Lowered the lamp in our
room and went to bed. About three in the morning, my
wife woke me; said sheep were running like they were
being chased; I said the dogs would not let any one come
on the place; Mr. Grehan told me the dogs would not let

any one come on the place. I then dozed off; my wife next called, "Clark! Clark! ain't that smoke?" I jumped up, examined, and found smoke coming through the cracks of the room locked up the day of the 3d; I told my wife it was in the room Mr. Grehan had locked; said it looked as if some one was trying to burn us alive; I got frightened and remembered threats Mr. Grehan had made me, if I didn't find some hogs that were lost. We pitched some things out of the window, and called on neighbors who lived near for help; I ran down stairs, found the fire was burning in the locked room; stopped a second to put on my pants outside, and noticed Flora, the bull dog, lying quietly; on reaching pasture gate, found cattle and mare all out; woke Baldwin and Prince, who lived about 150 yards from me, and we ran back to the house; I suppose I was gone four or five minutes; ran to the door of this room; I said it was locked; then ran around to the south window; this was only a sash nailed down; the east window of this room had a solid blind, which I always saw hooked when the room was open; I broke in the south sash and Baldwin got in; ran to the other window and found it unbolted; we fetched water and put out the fire; we examined the place and found a broken hame under the east window with the solid blind. Daylight came in a little while, and we found the floor saturated with kerosene; the smell of kerosene had been strong, almost suffocating; the floor was burnt through, and a demijohn, all broken, was under the hole; I recognized it as one Mr. Grehan sent kerosene to the place in, which I kept under the shelf in the kitchen on other side of the hall; I looked and found the demijohn gone from the kitchen; the fire burned through the floor and partition to next room up to the ceiling—a place large enough to drive a horse and wagon through; also there were some bags and barrels burnt; I then noticed all the gates to the pasture open and the cattle and gray mare out there; I looked for the dogs; they had never let any one but Mr. Grehan

and myself and wife come on the place; sometimes Snap would even be ugly to Mr. Grehan; Flora, the bull dog, I never knew to bark at Mr. Grehan; I heard Snap barking and found him tied down in the pea-field a hundred yards from the house; then I remembered I had only seen Flora at the time of the fire; I noticed tracks from the east window and followed them to the road; they looked to me like Mr. Grehan's tracks; I saw his tracks on the place every day nearly; worked with him, etc.; judging by distance of steps, should say party was in a run; the windows were as high as a man's shoulder from the ground; any one knowing of solid blind being unfastened could get in; I had never known blind to be unbolted before; Mr. Grehan had a key to that room; I broke the south window because I supposed east window was bolted; I did not see Mr. Grehan on the place April 4th, but did the day before. About usual time on morning of 5th, I came to Mr. Molina, justice of the peace, and told him about the fire. I went back out to one of my neighbors, Geb. Bell, and saw Mr. Grehan over at his place nailing up the south window; I stayed at Bell's till 6th or 7th, then moved my things to the city; Mr. Grehan had nothing in the house then; he had moved all his things on March 29th to town; I had a sewing machine, stove, table, dishes, etc.; I lived near Mr. Grehan when I moved in town; I never told him about the fire, because I felt he knew and had done it himself; I afterwards heard he was selling out, and for fear I would lose the money he owed me for my stay on the place, I employed Mr. Wade; he got the money and paid me; it was then Mr. Harden heard about the fire of the 5th; I never knew anything about the fire of the 9th till days after. I had some trouble with Mr. Grehan while on the place about some sheep and some hogs he lost; neighbors' dogs killed the sheep and I got him the pay for them; the hogs I never found what killed them

I don't know if lock on this door cost 25 cents or not; house was a two-story house, four rooms down stairs, four up;

hall ran through centre; it was a pretty good house, plastered and ceiled, and painted and whitewashed; different doors had different keys; some had none at all; two windows were on each side of the house; the front and back doors were bolted the night of the fire; all the windows, except the ones in the locked room, were bolted before I went to bed; John Prince, Baldwin, my wife and I were at the fire; Simmons was nearest neighbor; I hallooed for him; he did not hear; I found Snap tied with a chain I usually tied Flora with when I was there; I paid my expenses from Macon here, and stay here with my relatives; I left a job to come down here to testify, as I had promised; I have no understanding with Mr. Harden to get paid for my testimony. Mr. Grehan ordered me off the place the 1st of February; he never did again; I worked on after that well with him; on 2d and 3d of April, I went to see Mr. Grehan; he was not in town; on the 4th April, we came to town to collect money due my wife for sewing; I don't remember seeing Snap the evening of the 4th; I did not see him till I found him tied next day; the dogs got their feed from the butcher-pen in the pasture; I left the down-stairs open for Mr. Grehan when I went to town; he came about every day; I saw he had been there on the 4th; I might have broken open the door with an ax I had in the yard, but I was too excited to think of stopping to look for the ax; it was dark; the lock and hinges were iron, so I hurried after Prince and Baldwin; a hatchet was also somewhere round if I had thought of it. I told Mr. Molina Mr. Grehan had set the place afire; I told Mr. Harden it was no stranger who burnt the house; I helped plant the crop and only got paid when I sued; I didn't tell Mr. Grehan I was going to leave; I left the day of the fire; I have got $1.50 a day working with carpenters; $5 or $10 might have repaired the damage on the 5th of April.

Expert testimony also was introduced to show that an

attempt at incendiarism was regarded as an increase of risk.

The jury found for the plaintiff the full loss, with interest from April 9, and ten per cent damages, and $500.00 attorneys' fees.   The defendant moved for a new trial, on the grounds stated in the decision, which was overruled, provided the plaintiff would write off interest to the expiration of sixty days from proof of loss.   This was done, and defendant excepted.

W. H. WADE, for plaintiff in error.

RICHARDS & HEYWARD, for defendant.

HALL, Justice.

The defendant moved a new trial in this case upon the following grounds :

(1.) Because the verdict is contrary to the evidence, and without evidence to support it.

(2.) Because the verdict is decidedly and strongly against the weight of evidence.

(3.) Because the verdict is contrary to law and the principles of justice and equity.

(4.) Because the jury found, contrary to the charge of the judge, in this : " If this previous fire, or attempt to burn the place, took place before the 9th, several days before, and it was a fire that resulted in any material loss, and the defendant intentionally failed to communicate that fact, and swore his loss took place on the 9th, that would be false swearing."

(5 ) Because the jury found, contrary to the charge of the judge, in this: " The concealment of a fact material to be known, and which the plaintiff was under an obligation to communicate, constitutes fraud."

(6.) Because the jury found, contrary to the charge of the court, in this : If the company's agent acted from a fair and honest belief that this claim was not a just claim, and

the company had a defence to it, that would be in good faith, and the company would not be liable in damages.

(7.) Because the verdict in said case was illegal, null and void, as the said verdict was not written on the pleading, but was put on a separate piece of paper, and on a blank piece of paper, not designating the case in which it was rendered.

(8.) Because the court erred in admitting, over defendant's objection, evidence of bad faith, and attorneys' fees, as the same was not alleged in the declaration.

(9.) Because the court erred in charging the jury : " If you find this plaintiff did not wilfully or intentionally refrain from communicating the fact, believing it to be immaterial, then I charge you, if you find an attempt to burn the place took place on the 5th, several days before the property was destroyed, the fact that he failed to communicate it to the insurance company would not cause him to forfeit his policy."

(10.) Because the court erred in charging the jury : " I think in the case here the company is given sixty days in which to pay or not to pay. If the company refused to pay, and it turns out it refused to pay wrongfully, I think he has a right to recover interest from the time of the loss."

(11.) Because the court refused to charge: " The concealment of a fact material to be known need not be a fraudulent concealment."

(12.) Because the court omitted to charge, being one of the pleas of defendant, and being verbally requested : "Any increase of risk not brought to the attention of the company voids the policy."

(13.) Because the court refused to charge the jury that the insured was bound to notify the company of this first incendiary fire.

(14.) Because the court refused to charge the jury : "Fraud voids all contracts. Fraud may not be presumed, but, being in itself subtle, slight circumstances may be sufficient to carry conviction and authorize a verdict."

(15.) Because the court read to the jury and refused to charge, as requested by defendant: " If plaintiff swore, in his proof of loss, that his damage took place by reason of the fire of the 9th, when he knew a part of the loss was caused by the fire of the 5th, he can't recover," but qualified it by adding, " if that loss was immaterial and the damage was trifling, and the plaintiff made no claim in good faith, he can recover."

(16.) Because the court read to the jury defendant's request, and charged as follows: " I am requested to charge that circumstantial evidence is as good as direct; if you believe from it plaintiff set fire to the premises, you must find against him. I charge you on that, circumstantial evidence is good evidence, if you believe it; it is just as good as direct evidence, if you believe it, and is sufficient to predicate a verdict on. Circumstantial evidence will support a verdict."

(17.) Because the court read to the jury defendant's request to charge, and charged as follows: " If you find Grehan was occupying the house the night of the second fire, that his place of residence was really in town, then the house was vacant or unoccupied, and he can't recover. I do not charge you that; but if the house was unoccupied the night of the fire, and Grehan swore it was occupied, that would void the policy. But if Grehan slept in it and was occupying it at the time, that would be a sufficient occupation."

So much of the judge's charge as is necessary to the full understanding of the grounds of this motion is as follows:

"If plaintiff is entitled to recover his loss, the loss is fixed by the appraisement at $1,846.44. If you find that, several days before this loss, there was an attempt to burn the place, and, at the time of submitting his proof of loss, the insured intentionally failed to communicate that fact to the company, and you find this was a material fact, then this failure to communicate was a fraud and voids this policy, under clause 9, section 2. If plaintiff did not wilfully or intentionally refrain from communicating the fact, believing it immaterial, then it does not release the company. If plaintiff swore his loss took place on the 9th, and you find this previous fire did

material damage, and he intentionally failed to communicate, and swore his loss took place on the 9th, he would be guilty of false swearing, and it would void the policy; but if the loss was trifling, and plaintiff thought it immaterial, then it was not false swearing. If plaintiff was in any way concerned in the burning, of course he can't recover. It is not necessary to prove it as a criminal charge is proved. The company must prove it by a preponderance of evidence, or they do not make out their defence. I am requested to charge, the company had as much right to refuse payment after adjustment as before. I am requested to charge, if defendant believed insured set fire to the premises, they were right not to pay. I charge you, if the agent acted under an honest and reasonable belief that company was not liable, that would bear on the question of good faith. If plaintiff set fire to the premises on 4th or 5th, that voided his policy. Circumstantial evidence is good evidence, if you believe it; it is as good as direct, if you believe it; circumstantial evidence will support a verdict. I am requested to charge, and do charge, that a contract of insurance is like any other contract; the conditions are a part of the contract; the insured is bound to observe them; if he does not, and loss occurs, he can't recover. I am requested to charge, 'If you find that Grehan was occupying the house for the night of the second fire, and that his place of residence was really in town, then the house was vacant and unocupied; he can't recover.' I don't charge you that, but if the house was unoccupied the night of the fire, and Grehan swore it was occupied, that would void the policy; but if Grehan slept in it, and was occupying it at the time, that would be a sufficient occupation. Plaintiff is bound to as much good faith as defendant in the matter. The concealment of a material fact—material to be known, and which plaintiff was under an obligation to communicate — constitutes fraud. The plaintiff not only claims the right to recover his actual loss, but damages and attorney's fees; upon that I read you section 2850. If you believe this company refused to pay for sixty days after loss was due, and this refusal was in bad faith, the 'plaintiff is entitled to damages not greater than twenty-five per cent of the amount due, and reasonable attorney's fees. If the company's agent acted from a fair and honest belief that this claim was not a just claim, and the company had a defence to it, that would be good faith, and it would not be liable in damages; but if the defence was made simply to delay and embarrass the collection of the claim, not believing fairly and honestly that it had a good defence, then they would be liable. If the agent of the company acted recklessly, had no foundation for his belief that there was a defence—no probable cause for it—and acted recklessly, recklessness might amount, in a case of that kind, to bad faith; but if there was probable cause for his belief—if it was a fair and honest belief, although it was a mistaken belief, although

an unfounded belief—if it was a fair and reasonable belief that the company had a defence, it would not be liable in damages. If plaintiff is entitled to recover for his loss at all, and the company refused to pay wrongfully, I think interest should run from time of loss."

The verdict was for the amount of the loss, as found by the adjuster, with interest from the date of the fire, instead of sixty days thereafter, when the loss was payable, with ten per cent damages and five hundred dollars counsel fees. The motion for a new trial was refused on all the grounds except the tenth, and on that, if the plaintiff would write off the sixty days' interest between the fire and when the loss was payable, which was done.

The conditions of the policy, which it was claimed the plaintiff had violated, whereby he forfeited his right to recover, are as follows:

" 3. If the risk be increased by any change in the occupation of the building or premises herein described, or by the erection or occupation of adjacent buildings, or by any means whatever within the knowledge of the assured.

" 4. If any building herein described be or become vacant or unoccupied for the purpose indicated in this contract, or become occupied in whole or in part for other and more hazardous purposes than indicated in the contract.

" 9. Any fraud or attempt at fraud, or any misrepresentation in any statement touching the loss, or any false swearing on the part of the assured or his agent, in any examination, or in the proofs of loss or otherwise, shall cause a forfeiture of all claims on this company under this policy; and in such case this company shall have the right at any time to require the same to be delivered up to be canceled."

The questions material to be considered are:

1st. Whether the alleged fraudulent conduct of the plaintiff in concealing from the company, in his proof of loss, the occurrence of what it charges to have been an incendiary attempt to burn the building on the 5th of April, and which, it is alleged, he knew to be an incendiary attempt, was submitted by the court under proper instructions to the jury, on the facts in evidence.

2d. Whether the building was in fact occupied on the night of the fire, and whether its occupancy had been

abandoned previous to that occurrence, in the sense of that condition of the policy.

3d. Whether there were facts in evidence sufficient to show that the company acted in bad faith in withholding the payment of the loss from the plaintiff and in justifying the jury in finding damages and counsel fees against it on that ground.

1. The evidence was conflicting as to the extent of the burning on the 5th, and also as to the cause of that fire. The plaintiff swore that the injury from it was trifling, and that it would not have cost more than fifty or sixty cents to repair the damage; he then had no reason to suspect that it was a wilful burning, but thought it accidental; the damage done was so trifling that he did not consider it worthy of mention. There was nothing to the contrary but the testimony of certain negroes with whom he had had trouble, growing out of disputes concerning his dealings with them while they occupied the premises as his laborers, and from whose possession his hogs and sheep had disappeared under very suspicious circumstances. He suspected those discharged laborers of having started the fire on the 9th of April, and promptly communicated his suspicions to the agent of the company.

The charge of the court upon this question leaves the company nothing to complain of. It was in the terms of our Code, §2804, which seems to have been in accordance with the common law upon the subject. The concealment of facts enhancing the risk must have been done fraudulently in order to avoid the policy; it must have been wilful. Wood on Fire Insurance, §199, and citations; 58 *Ga.*, 426; *Ib*, 251, 255, 256. Where the policy provides "that any false swearing or attempt at fraud," or "if there shall appear any fraud in the claim by false swearing or otherwise," shall avoid the policy, the company, in order to avail itself of the defence, must show that the assured knowingly and intentionally swore falsely, or said or did that which is claimed to be fraudulent. There must be a

wilful intent to defraud rather than an innocent mistake. This condition of the policy extends to every matter material to be stated, or which the policy in terms required to be stated. Wood on Fire Ins., §429, and cases cited in notes 1, 2 and 3 there.

2. That the premises were occupied within the meaning of the policy at the time of the fire, we think can admit of no doubt either under the law or upon the facts given in evidence. Id., §§89, 180; 71 N. Y. R., 509, 512; 2 Cent. L. Journal, 478.

3. The rule as to damages and counsel fees and the circumstances under which they are to be allowed, is laid down with precision in the Code, §2850; it is that whenever it shall be made to appear to the jury trying the case that a demand has been made in terms of the law and the refusal of the company to pay the loss was in bad faith, then they may award the damages and attorney's fees thereby allowed. We think there were facts in evidence here which certainly justified, although they might not have required the jury to find damages and counsel fees for the plaintiff. The loss was promptly adjusted, and the company offered payment before the expiration of sixty days, if the plaintiff would discount the amount found to be due at 7 per cent—an offer which he declined because he knew of no investment which would yield him that interest; at the expiration of the period, he promptly applied for his money, but was put off a short time because, as was stated, the draft had not arrived; this was not the real cause, however, for refusing payment; they had received information, which they withheld from the plaintiff, implicating him in the burning; they did not disclose this until they were threatened with a suit; and after the suit was commenced, they threatened a prosecution to bring him to terms of settlement; they even went so far as to demand the surrender of his policy, that it might be cancelled, because, as they allege, before the expiration of the sixty days, they were put in possession of affidavits con-

clusively proving that the premises were fired on the 5th of April by an incendiary act and material damage was done thereto at that time; that the failure of the plaintiff to give notice of this fire to the agent of the company at that time, and his making no mention of the fact in the proof of loss, when he was well aware of it, constituted concealment or misrepresentation within the terms of the policy, which gave them the right of cancelling it at any time. The correspondence between the company and its agents rendered it altogether probable, if not certain, that each of these steps were parts of a plan to force the plaintiff into a settlement of the loss at a ruinous discount, or, to employ their own language, at a mere "stipend." This correspondence was produced under notice and ·was put in evidence. The ,jury doubtless considered it proof of bad faith, and they acted upon the presumption which it raised in giving damages for delaying payment. This, we decided in the *Cotton States Life Insurance Company vs. Edwards*, September term, 1884,* was within their province.

Judgment affirmed.